MCDONALD HOPKINS LLC
STEPHEN J. ROSENFELD (*pro hac vice application forthcoming*)
srosenfeld@mcdonaldhopkins.com
CHRISTOPHER G. DEAN (*pro hac vice application forthcoming*)
cdean@mcdonaldhopkins.com
300 North LaSalle Street, Suite 1400
Chicago, IL 60654
Telephone:  (312) 642-6103
Facsimile:  (312) 280-8232

SHARTSIS FRIESE LLP
FRANK A. CIALONE (Bar #172816)
fcialone@sflaw.com
MILES S. WINDER (Bar #306780)
mwinder@sflaw.com
One Maritime Plaza, Eighteenth Floor
San Francisco, CA  94111-3598
Telephone:     (415) 421-6500
Facsimile:      (415) 421-2922

Attorneys for Plaintiff
MICHAEL R. RATTAGAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MICHAEL R. RATTAGAN, | Case No. |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | **(1) BREACH OF FIDUCIARY DUTY;** |
| UBER TECHNOLOGIES, INC.; UBER INTERNATIONAL, BV; and UBER INTERNATIONAL HOLDINGS, BV, | **(2) DECEIT;**<br>**(3) FRAUD;**<br>**(4) INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;**<br>**(5) NEGLIGENCE** |
| Defendants. | |
| | **DEMAND FOR JURY TRIAL** |

*SHARTSIS FRIESE LLP*
*ONE MARITIME PLAZA*
*EIGHTEENTH FLOOR*
*SAN FRANCISCO, CA  94111-3598*

Plaintiff Michael R. Rattagan ("Mr. Rattagan"), by and through his undersigned attorneys, as and for his Complaint against defendants Uber Technologies, Inc., Uber International, BV, and Uber International Holdings, BV (collectively "Uber"), states as follows:

## PRELIMINARY STATEMENT

1.      This lawsuit arises out of Uber's recklessly orchestrated entry into the Argentine ride-sharing market and the unimaginable harm it inflicted on Mr. Rattagan, a highly respected business attorney in Buenos Aires and the former legal representative of certain Uber subsidiaries in the country.  As has been a pattern in Uber's entry into new markets, Uber took the approach that it is better to ask for forgiveness than for permission.  Its launches are typically tumultuous with the hope that Uber can later make it all right.  However, Uber could not do so in Buenos Aires.  Uber's launch in Buenos Aires was disastrous and continues to be so for Mr. Rattagan.  Because of Uber's callous attitude, Mr. Rattagan has endured and continues to endure years of criminal prosecution (facing many years in prison and the loss of his law license), has suffered through Argentine authorities raiding his offices, has had his civil liberties severely curtailed, and has sustained a staggering blow to his reputation both professionally and personally because of this widely publicized ordeal.

2.      In early 2013, years before its catastrophic launch, Uber retained Mr. Rattagan simply and solely to establish its initial corporate presence in Argentina.  Uber named Mr. Rattagan as its official legal representative in the country, two of his trusted colleagues as interim managers, and the offices of his law firm – in which he is a founding and name partner (the "Law Firm") – as Uber's legal domicile in Buenos Aires.  Several years then passed without any meaningful activity, and the relationship between Mr. Rattagan and Uber went dormant.  Then, in April 2016 – without consulting or even notifying Mr. Rattagan – Uber launched its service in Buenos Aires with the help of different advisors, who Argentine authorities publicly claim either ignored or disregarded the particularities of Argentine law, politics and business practice.  Public reaction to Uber's ill-advised launch was immediate, negative and entirely foreseeable.  Under intense pressure to act, authorities targeted the only public face of Uber in Argentina: Mr. Rattagan, his colleagues, and his Law Firm.  Police raided their office and homes, and they were

Case No.                                    COMPLAINT

vilified in the media, subjected to scorn and ridicule in social and professional gatherings, and ultimately charged with serious crimes – including aggravated tax evasion (carrying a prison term from three and a half to nine years) – all due to Uber's actions.  As a result, Mr. Rattagan's competency and ethics have been wrongfully called into question in the most public of forums.

3.     Although Uber has publicly and privately acknowledged its mistakes, and is paying for Mr. Rattagan's criminal legal defense, that limited indemnification does not, and cannot, compensate Mr. Rattagan for the severe emotional, consequential, and reputational harm he has suffered and continues to suffer.  This lawsuit seeks compensation for those substantial damages and also punitive damages for Uber's intentional and malicious conduct.

## THE PARTIES

4.     Mr. Rattagan is a citizen of Argentina.  He is a founding partner of a highly respected business law firm, based in Buenos Aires, Argentina, that serves multinational clients from the United States, Latin America, Europe, and Asia.  He is an experienced business lawyer, and, before Uber's launch in Buenos Aires, was one of the most respected advisors in the City.

5.     Uber Technologies, Inc. ("UTI") is a Delaware corporation with its principal place of business in San Francisco, California.  Uber International, BV ("UIBV") is a company formed under the laws of the Netherlands with its principal place of business in Amsterdam. Uber International Holdings, BV ("UIHBV") is a company formed under the laws of the Netherlands with its principal place of business in Amsterdam.  On information and belief, UTI controls UIBV and UIHBV, and UTI directed and authorized all of UIBV's and UIHBV's operational decisions relevant hereto from Uber's San Francisco headquarters.

## VENUE AND JURISDICTION

6.     This Court has subject matter jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1332 because: (a) Mr. Rattagan is a citizen of a different state and/or country than Uber; and (b) the amount in controversy exceeds $75,000, exclusive of costs and interest.

7.     Venue in this District is proper pursuant to 28 U.S.C. § 1391 because Uber is subject to personal jurisdiction in this District, and because a substantial part of the actions or inactions giving rise to Mr. Rattagan's claims occurred in this District.

- 2 -

8. Upon information and belief, Uber plans, oversees, conducts, and operates all of its international activities from and through its headquarters in San Francisco, California.

## ALLEGATIONS

### A. Mr. Rattagan's Background

9. As a lawyer licensed in Argentina and in the State of New York, Mr. Rattagan maintains an active practice counseling large multinational companies in various business matters, with an emphasis on transactions, investments, and interests in Argentina. After spending 17 years practicing in law firms with an international reach, he co-founded the Law Firm in 2005, where he co-heads its Mergers & Acquisitions and Natural Resources & Energy Groups, and is one of its primary sources of business development and origination. In addition to his Argentine law degree, Mr. Rattagan has an LLM from New York University School of Law and speaks Spanish, English, French, Portuguese, and Japanese.

10. For nearly 30 years in practice, Mr. Rattagan has carefully built and maintained an impeccable reputation for honesty and integrity and for advising his clients to adhere to the same in the conduct of their own businesses. This unyielding approach to compliance with the law placed Mr. Rattagan in a unique and prominent class of legal professionals in Argentina.

11. Mr. Rattagan's sterling reputation as a skilled lawyer and honest broker made him ideal counsel for multinational companies looking to do business in Argentina. As one of the top and most renowned business lawyers in Buenos Aires, much of his practice came from international referrals. As the main business generator of his firm for more than 13 consecutive years, an essential part of Mr. Rattagan's role was to travel extensively abroad to develop professional relations and create awareness of the investment climate and opportunities in Argentina while promoting the Law Firm and its abilities.

### B. Mr. Rattagan's Limited, Pre-Launch Engagement by Uber

12. In February of 2013, Liesbeth ten Brink – a former classmate from New York University School of Law who worked for Uber – contacted Mr. Rattagan. She explained that Uber tasked her with organizing its expansion into a number of Latin American countries, including Argentina.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

13.     In support of its anticipated expansion efforts, Uber enlisted Mr. Rattagan to assist in the creation of an Argentine subsidiary (the "Subsidiary") for Uber's future operations in Buenos Aires.

14.     The first step was to register two Uber entities as foreign shareholders ("Shareholders") of the Subsidiary, which Mr. Rattagan did on Uber's behalf.

15.     In connection with that process, Uber and Mr. Rattagan agreed that Mr. Rattagan would act as the Shareholders' legal representative in Argentina.  Under Argentine law, every foreign shareholder is required to have a local resident acting as its legal representative.  The role of the legal representative is to register a shareholder locally, incorporate a subsidiary on its behalf, attend shareholder meetings upon written instructions, and act as the face of the shareholder at any legal proceedings, such as trial.  The role of the legal representative is not to make decisions for the shareholders or to ensure that the shareholders or their affiliates, if any, comply with Argentine law (practically speaking, the legal representative has little to no ability to do so).

16.     Mr. Rattagan also permitted the Subsidiary to use his Law Firm's office as its pre-launch legal domicile until Uber could set up its own offices.  Mr. Rattagan further introduced Uber to two individuals of his trust – both known to the Law Firm – to act as interim manager and interim alternate manager of the Subsidiary.

17.     Pursuant to the agreed arrangement, in August 2013, the Law Firm registered the Shareholders of the Subsidiary with the Buenos Aires Office of Corporations.

**C.     Uber's Prominence Grows Worldwide**

18.     Following the above registration, the Law Firm's file on Uber went dormant.  In fact, during the latter half of 2013, all of 2014, and most of 2015, neither Mr. Rattagan nor the Law Firm was asked to (or did) provide any counsel or services related to Uber's future Argentine expansion.  The Law Firm's Uber file was, for all intents and purposes, dead.

19.     But while the file was dormant, Uber was active and growing around the world, and – unbeknownst to Mr. Rattagan and the Law Firm – secretly planning to launch in Argentina.

Case No.
COMPLAINT

20.     Although Uber boasts about its innovation, its launches in new jurisdictions have been characterized by a less-admirable pattern: initial, immediate, and often severe tension and conflict with local officials and unions, caused by its alleged disregard of local laws and customs (thus creating havoc and exposing people who are dragged into the quagmire), followed by negotiations that ultimately lead to a truce and legally compliant operations.

21.     Mr. Rattagan learned too late and at great personal expense that Uber's rapid growth followed this pattern throughout the United States and around the world. Prior to the launch, he and his colleagues awaited further contact and instructions concerning Uber's apparent stalled expansion into the City.  That instruction would never come.  So while Mr. Rattagan had no opportunity to advise Uber about how to conduct a launch in Argentina that would be prudent and peaceful, he and his offices were "conveniently used" (or abused) as a "front" for activities that Uber knew from its past experience would be chaotic at best.

**D.      Uber's Launch In Argentina**

22.     In March 2016, Mr. Rattagan attended an International Bar Association conference in Rio de Janeiro, Brazil.  While there, he observed a panel discussion focusing on the challenge new technology companies face when confronted with traditional regulations.

23.     Among the speakers was one Enrique Gonzalez ("Gonzalez"), an attorney from Mexico who at the time was Uber's Latin America Legal Director (after the events that are the basis of this complaint, in which he had a decisive and leading role, he was not censored but rather promoted to Associate General Counsel, Latin America).  During his talk, Gonzalez indicated that the day before he had met with all of Uber's legal advisors in the region.  Mr. Rattagan had had no prior communications with Gonzalez, and in fact he had no knowledge of Gonzalez's existence prior to the Rio de Janeiro conference.

24.     Puzzled and concerned, Mr. Rattagan emailed Gonzalez shortly after the conference to explain that there must be some mistake because, in Mr. Rattagan's mind, only members of the Law Firm had been acting for Uber in Argentina (even in a very limited way).  Mr. Rattagan proposed to meet or speak with Gonzalez and offered the Law Firm's expertise to help Uber navigate the issues surrounding the launch.  Uber never took Rattagan up on his offer.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111-3598

- 5 -

25.     On April 12, 2016, Mr. Rattagan received a spam email announcing that Uber had officially launched its operations in the City.

26.     Mr. Rattagan was shocked to learn this crucial development in such an impersonal manner.  As the Argentine legal representative of two Uber entities in the process of setting up the Subsidiary through which Uber was to operate, he had received no communication that Uber had begun preparing to launch in the country, let alone that it was in fact launching without what the City would immediately claim publicly was a lack of a basic legal infrastructure, including the lack of a registration for tax identification numbers with the City.

27.     On information and belief, Gonzalez was spearheading Uber's Latin America expansion and – without consulting or even informing Mr. Rattagan – had engaged another attorney in Buenos Aires to assist in Uber's preparations.  At no point before the launch did Uber inform Mr. Rattagan that it had engaged a new attorney for expansion into Argentina.

28.     Nor did Uber cause the new attorney to publicly announce his relationship with Uber, much less update the Office of Corporations records that showed Mr. Rattagan and the address of the Law Firm as the only links to the Shareholders and the Subsidiary "in formation."

29.     Consequently, when Uber launched in Argentina, the public records reflected that Mr. Rattagan, his colleagues, and the Law Firm's offices were Uber Shareholders' legal representative, the interim managers of the Subsidiary, and their legal domicile in the country, respectively – despite the fact that none of them had ever been consulted about or even made aware of Uber's plans.  Uber, in other words, allowed its new attorney to remain concealed while Mr. Rattagan, his colleagues, and the Law Firm unknowingly became the public names and faces of an ill-advised launch in which, obviously, they had played no part.  Uber camouflaged the actual Uber decision-makers in the shadows of anonymity while callously exposing Mr. Rattagan, his family, his colleagues, and the Law Firm to the hellish consequences of Uber's controversial launch strategy.

30.     Dismayed by the lack of communication, and deeply concerned about the liability they faced in their official positions as a result of Uber's secretive conduct and sudden launch, Mr. Rattagan and the interim manager and interim alternate manager tendered their resignations

Case No.

COMPLAINT

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

to Uber immediately thereafter.  But more than two months elapsed until their removal and replacement was made effective, leaving them exposed to liability as a result of Uber's local and offshore pre- and post-launch activities that Uber continued despite its knowledge that Argentine officials had "declared war" on Uber and were seeking to impose criminal liability on anyone truly or apparently linked to a traumatic and confrontational launch, predictably perceived and thus treated by the City authorities as illegal.

**E.      Fallout From Uber's Launch**

31.      The reaction of taxi drivers and labor unions to Uber's launch in Argentina was immediate, hostile and – for Uber – entirely predictable.  As with Uber's launches in London, Mexico City, Barcelona, and Sao Paulo, the launch in Buenos Aires was met with negative press, violent labor union demonstrations and protests, and street blockades throughout the City.  In fact, right before Uber's launch in Argentina, its launch in Colombia foretold the fallout that would result from the failure to properly register a new subsidiary in a South American country: amid protests from cab drivers and fines instituted by the nation's transport superintendent, the president of Colombia warned Uber that it could be banned from the country for its failure to formally register its operations.  Indeed, unlike in other cities and countries where Uber's initially tumultuous launches evolved into peaceful and legally compliant operations, its launch in Buenos Aires was especially confrontational, and Uber still faces threats, fines, and the revocation of its drivers' licenses.

32.      Because public records showed the Law Firm's office as the legal domicile for the two Shareholders and the Subsidiary, taxi drivers surrounded the Law Firm's building and protesters blocked its exits, preventing employees and clients from entering or exiting for hours.  Additionally, local media outlets were filled with angry interviews and negative coverage concerning Uber and all those associated with it, notably including Mr. Rattagan.

33.      On April 13, 2016, the day after the disastrous launch, Mr. Rattagan emailed Gonzalez, again requesting an urgent meeting to address the public outcry and backlash against Mr. Rattagan and the Law Firm.  Gonzalez simply responded that someone from his team would contact Mr. Rattagan soon.  No one ever did.  Instead, Uber acted (and continues to act) as if it

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

was/is content to let Mr. Rattagan, his colleagues, and the Law Firm bear the brunt of the negative public reaction and potential criminal consequences.

34.    Early on Friday, April 15, 2016, Mr. Rattagan again emailed Gonzalez and asked to be replaced as the legal representative of the Shareholders and asked Gonzalez to provide the address of the new legal domicile for the Uber entities in the City.  Gonzalez did not act on this request.

35.    Just as Mr. Rattagan and his team became the targets of severe public animosity, Argentine authorities quickly engaged their law enforcement arms to investigate how to stop Uber.

36.    Midday on April 15, 2016, a City inspector came to the Law Firm's offices with orders "to immediately cease [Uber's] activities."  After lengthy discussions with City officials, a partner of Mr. Rattagan narrowly avoided having the Law Firm's offices closed.  But the ordeal was far from over.

37.    Later that day, in the early evening hours, a small army of City inspectors and police officers stormed into the Law Firm's offices, announcing an order to shut down Uber. According to the "acta" (akin to a search warrant) that the officers carried, the raid was the result of a charge of "contravention," *i.e.*, the alleged private use of public space, for commercial gain, without a permit.

38.    To the shock of the Law Firm lawyers and staff, television reporters evaded security and filmed inside the offices while the police carried out the raid.  The prime-time news programs displayed the Law Firm logo and name, which prominently includes Mr. Rattagan's name, and falsely reported that the Law Firm's offices were the location of Uber's illegal activities, which included tax evasion.

39.    Compounding the trauma of the raid on the Law Firm's offices, authorities searched the homes of Mr. Rattagan's trusted colleagues who had agreed to serve as interim manager and interim alternate manager of the Subsidiary while in formation, as their spouses and children watched in horror.  Although Mr. Rattagan's home has not yet been raided, the threat

Case No.                                     COMPLAINT

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

1    remains, causing a constant fear that his family will be the next victim of the natural

2    consequences of Uber's actions.

3       40.    On April 16, 2016, Mr. Rattagan wrote Gonzalez a pointed email to notify him of

4    the office raid, address Uber's inexplicable failure to timely disclose its ongoing activities and

5    ultimate launch to Mr. Rattagan, and inquire how Uber planned to rectify the situation.

6       41.    On April 18, 2016, Mr. Rattagan finally spoke with Gonzalez who, however, was

7    dismissive of the trauma inflicted on Mr. Rattagan, his colleagues, and the Law Firm, and sought

8    to minimize the gravity of the situation.  Gonzalez never even apologized, and Uber maintains

9    this callous disregard of its continuing outrageous conduct to this day.

10      42.    By this point, the prospect of potential civil and criminal liability related to Uber's

11    launch was known – indeed, City tax authorities had already formally requested documents from

12    Mr. Rattagan's colleagues.

13      43.    On May 12, 2016, a month after Uber's launch and nearly four weeks after the

14    raids on the Law Firm, Gonzalez finally came to Argentina and met with Mr. Rattagan.  Despite

15    being aware of the trauma that was causing Mr. Rattagan and his colleagues suffered and

16    continued to suffer, Gonzalez maintained Uber's approach of showing no concern for the harm

17    Uber's ill-conceived launch was causing to Rattagan.

18      44.    Gonzalez made it clear that Uber had no interest in cooperating with Mr. Rattagan

19    or the Law Firm.  According to Gonzalez, assisting with Uber's activities in Argentina was none

20    of Mr. Rattagan's business, as Uber had other legal counsel and consultants advising it in the

21    country.

22      45.    Mr. Rattagan reiterated that his resignation and those of his colleagues should be

23    acknowledged at once and all of them immediately replaced.  Undeterred, and notwithstanding

24    the risk posed to Mr. Rattagan and his colleagues, Uber delivered a letter concerning the launch

25    to City officials that showed the Law Firm office address and name, clearly – but falsely –

26    implying that the Law Firm was responsible for it.  Officials (the same ones who Uber was trying

27    to appease) were furious, and the day after the letter was delivered, they called the Law Firm

28    demanding an explanation that the Law Firm could not provide.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

- 9 -

46.     Having received nothing but contempt, inaction, and open hostility from Gonzalez, on May 26, 2016, Mr. Rattagan reached out to Salle Yoo ("Yoo"), Uber's Chief Legal Officer, General Counsel, and Corporate Secretary, to explain the situation and seek her direct involvement to handle a situation that had clearly gone astray in the hands of Gonzalez.  Among other things, Mr. Rattagan asked Yoo "to promptly designate someone [the Law Firm could] talk to with the purpose of handing over of all [its Uber] files in an orderly manner," and "instruct [her] team to immediately refrain from mentioning or invoking [the Law Firm's] name and from using [its] offices as legal domicile in any future communications with the Argentine government (national, provincial or city levels) or with any third parties without [its] prior written consent."

47.     Yoo responded that day, and expressed concern for the "inconvenience" Mr. Rattagan and his firm experienced since Uber's launch in Argentina, and she subsequently assigned Todd Hamblet (Uber's Managing Counsel, Corporate) to handle the matter from "HQ."

48.     Despite Yoo's professed concern about the position in which Mr. Rattagan and the Law Firm had been placed by Uber's ill-advised launch, Uber continued to carry out its Argentine operations in exactly the same manner, thus further exposing Mr. Rattagan and the Law Firm to the ongoing and increasingly severe danger of additional public scrutiny and criminal liability.  Yoo, Hamblet, Gonzalez, and Uber all knew that Argentine authorities were investigating Mr. Rattagan for serious crimes involving allegations that Uber failed to register to do business in Buenos Aires, failed to comply with applicable laws and regulations pertaining to the transportation of people, and failed to pay appropriate local taxes.  But, Uber nevertheless continued to operate without change or apparent concern for the consequences.

49.     For approximately two months after Mr. Rattagan tendered his resignation, Uber operated with its full cadre of drivers (racking up millions in alleged unpaid taxes) while Mr. Rattagan remained, at the Office of Corporations, as the formal legal representative of the Shareholders.  During that time, Uber knowingly left Mr. Rattagan (and his colleagues) as the sacrificial lambs for the scorn of the public and the criminal investigations of the Argentine authorities.

Case No.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

**F.     The Criminal Charges**

50.     Argentine authorities claimed that when Uber launched in Argentina, the process to incorporate the Subsidiary had not been completed.  As a result, the authorities claimed that the Subsidiary was still "in formation" – making its Shareholders liable for actions attributed to the company – and prohibiting Uber from applying for or obtaining a tax ID, which is necessary to open a bank account, hire staff, lease an office, and transact business.  That did not stop Uber.

51.     Upon information and belief, Uber's secretive preparations for the launch were significant.  Uber had to send foreign employees into Argentine territory to recruit, train, and equip drivers, and contract with intermediate payment companies that would process credit card charges and distribute the related funds.  Mr. Rattagan was never informed that these activities were going on behind his back, and he did not participate in them in any way.

52.     Although Mr. Rattagan had no role in Uber's conduct leading up to and following the launch in Argentina, Uber's shadow operation and failure to appoint a different legal representative led a City prosecutor (the "Prosecutor") to wrongly associate Mr. Rattagan with those who were involved in that covert pre-launch behavior.

53.     In April 2017, approximately one year after the disastrous launch, and despite having no involvement in Uber's activities, Mr. Rattagan, as former legal representative of Uber's two foreign entities in Argentina, was personally charged with unauthorized use of public space with a commercial aim.

54.     The Prosecutor was not done.  Because the Prosecutor claimed Uber had failed to register its Subsidiary and pay appropriate sales tax, the Prosecutor quickly broadened the scope of his investigations to include more serious criminal issues.

55.     In November 2017, the Prosecutor charged Mr. Rattagan with a second crime based on Uber's clandestine launch: aggravated tax evasion.  Conviction on that charge carries a three-and-a-half to nine-year prison sentence.

56.     Compounding the already massive problem for Mr. Rattagan, the alleged tax evasion was supposedly aggravated due to the volume of Uber's sales in the year after the launch.  Had Uber taken immediate steps to replace Mr. Rattagan as its legal representative in

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

Argentina prior to the launch, or stopped operating while the Prosecutor was claiming that Uber was acting illegally, the amount of the supposedly unpaid taxes while Mr. Rattagan was legal representative of the Shareholders would have been far less – and thus the charge against him would not have been "aggravated," and may not have been filed at all.  In other words, Uber's reckless and unmitigated conduct caused the charges against Mr. Rattagan (which should not have been filed in the first place) to become aggravated and much more severe.

57.     In December 2017, Mr. Rattagan was summoned to appear before the Prosecutor. It was the worst, most humiliating ordeal of his life.  Prior to being interrogated in connection with the preparation, launch, and subsequent operations (of which he knew nothing), he was taken to a room to have his mugshot and fingerprints taken – thirteen separate times so original prints could be sent to each interested government agency.

58.     Adding insult to injury, the Argentine court temporarily banned Mr. Rattagan from traveling abroad, preventing him from freely conducting his professional activities and jeopardizing his contribution to the Law Firm.  The Prosecutor labeled Mr. Rattagan a flight risk and publicly announced that he would be detained and imprisoned if he attempted to leave the country.  The news went viral and exacerbated the severe embarrassment and anguish that Mr. Rattagan already was suffering.

59.     While taxi drivers, labor unions, and politicians sought a public face to direct their ire, Mr. Rattagan was smeared in the local media for his supposed role in Uber's conduct.  His name became inseparable from Uber's claimed illegal operations and aggravated tax evasion.

**G.     Harm Mr. Rattagan Suffered As A Result of Uber's Actions**

60.     Mr. Rattagan's success as a name partner of a respected international law firm is the product of a lifetime spent building a reputation based on integrity and ethical conduct.

61.     As a result of Uber's fateful launch in Argentina, Mr. Rattagan's name is synonymous with tax evasion and illegal commercial operations by a foreign business.  His reputation has been dragged through the proverbial mud.  Indeed, due to the publicity surrounding the raids and charges against him, Mr. Rattagan has – in effect – been walking around with a sign across his chest that he is an accused felon.  Although he attempts to explain

Case No.                                                                                                  COMPLAINT

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

to colleagues, friends, and family that, despite the allegations against him, he is innocent, such protestations cannot alleviate the reputational stigma.

62.     Instead of stopping its operations that officials were charging were illegal and that were exacerbating the criminal charges against Mr. Rattagan, Uber simply offered Mr. Rattagan that it would help pay for a reputation management firm.

63.     Worse, while Mr. Rattagan is already the target of two criminal proceedings, which have impacted and continue to threaten his and his family lifestyle, his Argentine legal advisors have warned him that he may yet face additional charges for Uber's actions, such as money laundering, VAT and income tax evasion, and failure to make social security contributions.  He lives – and will continue to live for many years, as events unfold – under the constant threat and fear of further humiliation, wasted time and energy, and the physically exhausting emotions of facing charges that jeopardize his freedom, reputation, peace of mind, and livelihood.  All of that and more hang in the balance – all because Uber schemed to launch operations in Buenos Aires without the knowledge of or care for the effect on Mr. Rattagan.

64.     Having expanded across the globe, Uber has to be intimately aware of the fallout that occurs when it enters a new market using its established methods of disruption and confrontation.  Uber knew of the harm that would – and did – befall Mr. Rattagan upon its launch, yet it failed to disclose its plans or take any steps to protect Mr. Rattagan, his colleagues, or his Law Firm from the foreseeable result.  Nor did it act to mitigate the damaging effects of that harm after being specifically warned by Mr. Rattagan of the injury it was inflicting on them.

65.     Instead, Uber, a multi-billion dollar international behemoth with near limitless resources, allowed Mr. Rattagan, who played no role in its operations, to be thrown to the wolves and bear the brunt of the eminently predictable public outcry, labor union and taxi driver rage, political pressure, police actions, and criminal charges.  With Mr. Rattagan as a scapegoat, Uber's real Argentine counsel and advisors continued to operate behind the scenes unscathed.

66.     Indeed, Uber's approval of the way its launch in Argentina unfolded is evidenced not only by its refusal to alter its conduct but also by its promotion of Gonzalez – the architect of Uber's Argentine campaign and Mr. Rattagan's misery.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

67.     The harm that Mr. Rattagan suffered could have been avoided if Uber: (i) stopped operations while the Argentine authorities were charging that it was illegally operating; (ii) replaced Mr. Rattagan as legal representative before its launch; or (iii) advised Mr. Rattagan of its intentions pre-launch.

68.     Acknowledging the harm its actions caused him, Uber has, to date, paid for Mr. Rattagan's criminal defense and his time in responding to the fallout from the launch.  That partial indemnification, however, does not compensate Mr. Rattagan for the significant emotional trauma and serious damage to his reputation that he has endured.  Nor does it compensate him for the significant loss in future revenue resulting from such reputational damage.  Such compensatory damages alone constitute many millions of dollars.

69.     Mr. Rattagan also seeks punitive damages, in addition to compensatory damages, to punish Uber for its intentional and malicious conduct, and deter it from similar conduct in the future.

**FIRST CAUSE OF ACTION**
**Breach of Fiduciary Duty**

70.     Mr. Rattagan repeats and realleges paragraphs 1 through 69 of this Complaint as though reproduced in full herein.

71.     Under Argentine law, the legal representative of a foreign company has a legitimate interest in ensuring the good operation and standing of such company, because he or she conceivably could be exposed to personal criminal and civil liabilities for unlawful conduct by the company.  Indeed, no reasonable and reputable individual would agree to act in such a capacity if there were any possibility that such harm would befall them for corporate conduct that is entirely outside of their control.

72.     A company owes such legal representative a fiduciary duty not to subject that legal representative to personal liability.

73.     By asking Mr. Rattagan to serve as the legal representative of the Shareholders and thus exposing him to personal liability for any alleged noncompliance with the law, Uber assumed a fiduciary duty to Mr. Rattagan to, among other things:

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

(a) inform him of its planned activities in Argentina and provide him with the information necessary to ensure Uber's good operations in the country and protect himself, his Law Firm, and his colleagues from any liability and reputational harm;

(b) operate its business within the constraints of the local laws;

(c) immediately cease any allegedly unlawful business practices; and

(d) remove Mr. Rattagan as its legal representative as soon as it determined that it no longer desired to communicate with him and/or heed his advice so as to reduce or eliminate the risk and potential legal liability to which Mr. Rattagan might be exposed as a result of its business practices, or, in the alternative, to cease operations in Argentina until such time as Uber could remove Mr. Rattagan as its legal representative.

74. Uber breached its fiduciary duty to Mr. Rattagan by, among other things:

(a) failing to notify him in advance of its planned expansion activities, strategy, timeline, and business practices in Argentina;

(b) failing to consult with him before launching in Argentina regarding the various statutory and regulatory requirements for operating in the country;

(c) preventing him from ensuring the good operations of the companies for which he had been named legal representative and its affiliates;

(d) denying him an opportunity to protect himself from legal liability and reputational harm as a result of its entry into the Argentine market when it kept him in the dark about its plans;

(e) ignoring early warnings from regulators and other Argentine authorities that its business practices were claimed to be unlawful;

(f) denying Mr. Rattagan an opportunity to mitigate any damages;

(g) exacerbating the liability Mr. Rattagan faced by continuing its business practices that Argentine authorities claimed were unlawful notwithstanding the warnings it received;

(h) exposing Mr. Rattagan to significant public scorn and reputational damage by falsely associating him with Uber's conduct; and

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

(i)      failing to remove Mr. Rattagan as a legal representative as soon as it determined that it no longer wished to communicate with him and/or heed his advice.

75.     As a direct and proximate result of Uber's breaches of its fiduciary duty, Mr. Rattagan has suffered considerable damages.  Among other things, he has been charged with aggravated tax evasion and other crimes, threatened with imprisonment and the loss of his law license if convicted, lost business opportunities and revenues, endured severe emotional distress, been subject to harsh public scorn and ridicule, and suffered serious damage to his most important personal and professional asset – his good name and reputation.

WHEREFORE, on his First Cause of Action, Mr. Rattagan respectfully requests that the Court enter judgment in his favor against Uber for damages in an amount to be determined at trial, court costs, attorneys' fees, punitive damages, and such other and further relief as is appropriate.

### SECOND CAUSE OF ACTION
### Deceit

76.     Mr. Rattagan repeats and realleges paragraphs 1 through 75 of this Complaint as though reproduced in full herein.

77.     Uber willfully and intentionally engaged in fraud and deceit as defined by California Civil Code § 1709 - 1710.

78.     Uber induced Mr. Rattagan to continue serving as the legal representative of the Shareholders in Argentina by suppressing the fact that Uber: (a) had hired different legal counsel and advisors in the country; (b) was preparing to launch in Buenos Aires in a manner that authorities claimed was illegal; and (c) would neither cease operations nor change its practices to comply with directives of Argentine authorities before replacing him as legal representative.

79.     Uber further concealed that it intended to continue operating in violation of directives from Argentine authorities that its operations were in violation of the law during such period.

80.     Uber was obligated to disclose the concealed facts due to its attorney/client and contractual relationship with Mr. Rattagan, and also due to the fact that it had appointed Mr.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

1   Rattagan as the legal representative of its Shareholders in Argentina, a position that might – and

2   did – expose him to substantial criminal and civil penalties based on Uber's conduct.

3       81.    Uber knowingly and intentionally concealed these facts.

4       82.    Mr. Rattagan reasonably relied on Uber's omission of these crucial facts, and was

5   justified in doing so due to, among other things, their attorney/client and contractual relationship,

6   and the official position of legal representative to which Uber had appointed him.

7       83.    Uber's concealment of those facts from Mr. Rattagan placed him at risk of

8   conviction for multiple crimes (including aggravated tax evasion), prison, and loss of his law

9   license, and did in fact cause him loss of business opportunities and revenues, severe emotional

10   distress, and serious damage to his most important personal and professional asset – his good

11   name and reputation.

12       WHEREFORE, on his Second Cause of Action, Mr. Rattagan respectfully requests that

13   the Court enter judgment in his favor against Uber for damages in an amount to be determined at

14   trial, court costs, attorneys' fees, punitive damages, and such other and further relief as is

15   appropriate.

16   ### THIRD CAUSE OF ACTION
                    Fraud

17

18       84.    Mr. Rattagan repeats and realleges paragraphs 1 through 83 of this Complaint as

19   though reproduced in full herein.

20       85.    Uber knowingly and fraudulently induced Mr. Rattagan to continue serving as the

21   legal representative of the Shareholders in Argentina by suppressing the fact that Uber: (a) had

22   hired different legal counsel and advisors in the country; (b) was preparing to launch in Buenos

23   Aires in a manner that authorities claimed was illegal; and (c) would neither cease operations nor

24   change its practices to comply with directives of Argentine authorities before replacing him as

25   legal representative.

26       86.    Uber further knowingly and fraudulently concealed that it intended to continue

27   operating in violation of directives from Argentine authorities that its operations were in

28   violation of the law during such period.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

87.     Uber was obligated to disclose the concealed facts due to its attorney/client and contractual relationship with Mr. Rattagan, and also due to the fact that it had appointed Mr. Rattagan as the legal representative of its Shareholders in Argentina, a position that might – and did – expose him to substantial criminal and civil penalties based on Uber's conduct.

88.     Uber concealed those material facts to induce Mr. Rattagan to take no action to remove himself as legal representative of the Shareholders, leaving him as the target for both the general public and the Prosecutor.

89.     Mr. Rattagan reasonably relied on Uber's omission of these crucial facts, and was justified in doing so due to, among other things, their attorney/client and contractual relationship, and the official position of legal representative to which Uber had appointed him.

90.     Uber's concealment placed Mr. Rattagan at risk of conviction for multiple crimes (including aggravated tax evasion), prison, and loss of his law license, and did in fact cause Mr. Rattagan loss of business opportunities and revenues, severe emotional distress, and irreparable damage to his most important professional asset – his reputation.

WHEREFORE, on his Third Cause of Action, Mr. Rattagan respectfully requests that the Court enter judgment in his favor against Uber for damages in an amount to be determined at trial, court costs, attorneys' fees, punitive damages, and such other and further relief as is appropriate.

### FOURTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

91.     Mr. Rattagan repeats and realleges paragraphs 1 through 90 of this Complaint as though reproduced in full herein.

92.     Uber's continuing conduct in exposing Mr. Rattagan, the legal representative of the Shareholders, to police raids, serious criminal charges, public humiliation, and reputational harm by concealing its actions in preparing for and launching in Argentina and through its post-launch conduct was and is outrageous and extreme.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

93.     Uber's continuation of business activities that exposed Mr. Rattagan to serious criminal charges, public humiliation and reputational harm even after authorities had publicly advised Uber of the consequences of its ongoing activities is outrageous and extreme.

94.     Uber recklessly disregarded the probability that its secretive and reckless launch in Argentina would result in police raids, serious criminal charges, public humiliation, and reputational harm to Mr. Rattagan and thus cause severe emotional distress to him.

95.     Even after being publicly warned of the possible consequences of its conduct, Uber continued to recklessly disregard the probability that its ongoing business practices would result in police raids, serious criminal charges, public humiliation, and reputational harm to Mr. Rattagan and thus cause severe emotional distress to him.

96.     Mr. Rattagan has suffered, and continues to suffer, severe and extreme emotional distress because of Uber's conduct, and (a) he lives under constant fear that he, his wife, and his children will be exposed to similar raids at home; (b) he faces the deeply unsettling prospect of devoting years to defend himself from criminal charges that expose him to nearly a decade in prison and the loss of his law license; and (c) his reputation in the community has been seriously harmed.

97.     As a direct and proximate result of Uber's secretive preparation and launch in Argentina, and its unabated operations and conduct even after authorities publicly advised Uber of the consequences of those activities, Mr. Rattagan suffered, and continues to suffer, severe and extreme emotional distress.

98.     Mr. Rattagan has been damaged by Uber's intentional infliction of emotional distress in an amount to be determined at trial.

WHEREFORE, on his Fourth Cause of Action, Mr. Rattagan respectfully requests that the Court enter judgment in his favor against Uber for damages in an amount to be determined at trial, court costs, punitive damages, attorneys' fees, and such other and further relief as is appropriate.

SHARTSIS FRIESE LLP
ONE MARITME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

1

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

## FIFTH CAUSE OF ACTION
### Negligence
### (In the alternative to Causes of Action First through Fourth)

99.     Mr. Rattagan repeats and realleges paragraphs 1 through 98 of this Complaint as though reproduced in full herein.

100.     Uber owed a duty of care to Mr. Rattagan based on: (a) their attorney/client and contractual relationship, including the covenant of good faith and fair dealing implicit in such relationship; (b) the fact that Uber had appointed Mr. Rattagan as the legal representative of its Shareholders in Argentina, a position that might – and did – expose him to substantial criminal and civil penalties for Uber's conduct; and (c) Uber's independent duty to replace Mr. Rattagan as its legal representative when it decided to exclude him from any communications and planning related to its launch, and also immediately upon his resignation.

101.     Uber breached that duty by launching in Buenos Aires without contacting Mr. Rattagan and without regard for the authorities' public claims that it was violating law, exposing Mr. Rattagan to substantial peril.

102.     Uber further breached that duty by not ceasing or regularizing its operations and exposing Mr. Rattagan to greater damages and criminal prosecution.

103.     As a direct and proximate result of Uber's negligent breaches of its duty of care, Mr. Rattagan has suffered considerable damages.  Among other things, Mr. Rattagan has been charged with aggravated tax evasion and other crimes, threatened with imprisonment if convicted and the loss of his law license, lost business opportunities and revenues, endured severe emotional distress, been subject to harsh public scorn and ridicule, and suffered irreparable damage to his most important personal and professional asset – his good name and reputation.

WHEREFORE, on his Fifth Cause of Action, Mr. Rattagan respectfully requests that the Court enter judgment in his favor against Uber for damages in an amount to be determined at trial, court costs, punitive damages, attorneys' fees, and such other and further relief as is appropriate.

Case No.                                    COMPLAINT

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111-3598

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.    Entry of judgment for Plaintiff on each of his claims;

2.    For damages, direct and consequential, in an amount according to proof in excess of the jurisdictional limit;

3.    For punitive damages;

4.    For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY

Michael R. Rattagan demands a trial by jury for all issues so triable.

Dated:  April 12, 2019

SHARTSIS FRIESE LLP

*/s/ Frank A. Cialone*

By:      FRANK A. CIALONE

Attorneys for Plaintiff
MICHAEL R. RATTAGAN

Case No.                              COMPLAINT