UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL R. RATTAGAN,<br><br>    Plaintiff,<br><br>    v.<br><br>UBER TECHNOLOGIES, INC.,<br><br>    Defendant. | Case No. 19-cv-01988-EMC<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS AND DISMISSING CASE WITH PREJUDICE**<br><br>Docket No. 67 |

## I.   INTRODUCTION

Michael Rattagan ("Plaintiff" or "Mr. Rattagan") is a lawyer based in Argentina. Defendant is Uber Technologies, Inc. ("Uber Technologies" or "Defendant"). The operative complaint is Mr. Rattagan's Third Amended Complaint, through which he asserts four causes of action—fraudulent concealment, negligence, breach of the implied covenant of good faith and fair dealing, aiding and abetting fraudulent concealment—stemming from allegations that Defendant Uber Technologies, Inc. retained him to provide legal support for the launch of new operations in Buenos Aires, proceeded without engaging his services, and subjected him to intense public backlash and ultimately criminal prosecution. Uber moves to dismiss the Third Amended Complaint with prejudice.

## II.   BACKGROUND

A.   Factual Background

Plaintiff alleges as follows. Mr. Rattagan is "a prominent lawyer in Buenos Aires." Third Amended Complaint ("TAC") ¶ 1, Docket No. 64. In February 2013, Uber Technologies decided to expand its ride-hailing service into Buenos Aries and "used two of its [Dutch] subsidiaries to

hire Rattagan to reserve the name, form and register a local Buenos Aires entity, and provide legal advice on the process." *Id.*  Uber Technologies "also directed the two entities to use Rattagan as their formal legal representative and his business address as their local domicile." *Id.* ¶ 2.

Mr. Rattagan alleges that the "Dutch entities were merely agents controlled by their principal, [Uber Technologies], with respect to all substantive decisions, communications and activities vis-à-vis Mr. Rattagan and the Rattagan firm." *Id.*  Moreover, Uber Technologies "exercised such complete dominion and control over the Dutch entities that but for their existence, [Uber Technologies] would have had to perform the identical 'services' provided by the Entities," such that "even in 2013, [Uber Technologies] as principal effectively hired Rattagan.  As a result of this agency/principal relationship, [Uber Technologies] is responsible for all of the actions of the Dutch entities." *Id.*

"2014 was a period of relative inactivity between the Dutch entities and Rattagan.  Beginning in early 2015, however, the situation changed dramatically." *Id.* ¶ 3.  Mr. Rattagan alleges that Uber Technologies' efforts to launch operations in Buenos Aires accelerated at that time, and that Uber Technologies itself—rather than the Dutch subsidiaries—"hired Rattagan to provide a slew of new legal services and advice regarding the formation of multiple Argentine entities that would enable UTI to provide Uber Ridesharing in Argentina." *Id.*  In support of that contention, Mr. Rattagan alleges that all of the directives about the scope of his work "came directly from [Uber Technologies'] legal department in San Francisco" and that all his work product was provided directly to that same department. *Id.*  He contends that a direct attorney-client relationship was established between himself and Uber Technologies by February 2015. *Id.*

Several months later, toward the end of 2015, Uber began to plan the specifics of its launch in Buenos Aires. *Id.* ¶ 4.  However, it concealed that fact and its planning process (which involved hiring a different attorney and a public relations firm and holding meetings with government officials in Argentina) from Mr. Rattagan. *Id.*  When Uber ridesharing officially launched in April 2016, Mr. Rattagan contends that it did so "without first removing Rattagan from harm's way, . . . [and] knowing that it was doing so in blatant disregard of the local government's warnings that it would be unlawful." *Id.* ¶¶ 5, 6.  The company launched without

"any prior notice or forewarning to Rattagan" and with "absolute certainty" that the launch "would be met with [and] immediate and adverse reaction." *Id.* ¶ 6.

Mr. Rattagan alleges:

> The response to UTI's Uber Ridesharing launch was swift and predictable: thousands of local taxi drivers stormed both the local government transportation offices and Rattagan's law offices in protest. Within a couple of days, law enforcement authorities targeted the only public faces of Uber in Argentina: Rattagan and his colleagues who he had introduced to UTI to be interim managers of the then "in formation" local entity (after formation, UTI was to substitute permanent managers in their place). Buenos Aries police raided their offices and homes, they were vilified in the media and subjected to scorn and ridicule in social and professional gatherings. In 2017, after the authorities completed their investigation of UTI's launch, they summoned Mr. Rattagan to the local prosecutor where he was fingerprinted, had his mug shots taken and was charged with various crimes, including aggravated tax evasion.

*Id.* ¶ 7. Although Uber Technologies had been paying Mr. Rattagan's criminal defense fees related to his prosecution for aggravated tax evasion, it ceased doing so when he filed this lawsuit. *Id.* ¶ 8.

B.     Procedural Background

In his original complaint, Mr. Rattagan named three Uber entities as defendants: the U.S.-based Uber Technologies, Inc. as well as Uber International, BV ("UIBV") and Uber International Holdings, BV ("UIHBV"), companies formed under the laws of the Netherlands with their principal place of business in Amsterdam.  Docket No. 1 ¶ 5.  (UIBV and UIHBV are hereinafter collectively referred to as the "Uber International Entities" or the "international Uber entities.") He alleged that "[Uber Technologies] controls UIBV and UIHBV, and [Uber Technologies] directed and authorized all of UIBV's and UIHBV's operational decisions . . . from Uber [Technologies'] San Francisco headquarters."  *Id.*  The complaint explained that Mr. Rattagan was hired as the "legal representative of certain Uber subsidiaries in [Argentina]," *id.* ¶ 1, apparently referring to the Uber International Entities which became foreign shareholders ("Shareholders") of the Argentinian Subsidiary, Docket No. 1 ¶¶ 14–15.  However, the remainder of the allegations in that complaint were directed simply at "Uber" generally, without differentiation between the three entities.

3

Shortly after Mr. Rattagan initiated this suit, the three Uber entities notified his counsel of their belief that that the complaint contained a "fatal jurisdictional defect," namely that "[d]iversity jurisdiction does not encompass a foreign plaintiff, such as Mr. Rattagan, suing foreign defendants," such as the Uber International Entities. Sanctions Mot. at 2; *see* Docket No. 27-1 ¶ 8.

Mr. Rattagan thereafter filed a First Amended Complaint ("FAC"), removing the Uber International Entities as defendants and redefining "Uber" to mean only Uber Technologies. FAC at 1. Otherwise, the FAC was largely unchanged from the original complaint with one exception – Mr. Rattagan had removed the part of the original complaint that explained "Uber International, BV ('UIBV') is a company formed under the laws of the Netherlands with its principal place of business in Amsterdam. Uber International Holdings, BV ('UIHBV') is a company formed under the laws of the Netherlands with its principal place of business in Amsterdam. On information and belief, UTI controls UIBV and UIHBV, and UTI directed and authorized all of UIBV's and UIHBV's operational decisions relevant hereto from Uber's San Francisco headquarters." Docket No. 1, ¶ 5; Docket No. 15, ¶ 5. The import of the amendment was that all of the allegations previously directed at the three Uber entities collectively were now asserted solely against Uber Technologies.

Uber Technologies attacked Rattagan's FAC in two ways. First, it moved for sanctions against Rattagan, contending that his claims were based on a factual premise—that there was an attorney-client and contractual relationship between Rattagan and Uber Technologies—that was false, because it was Uber's international subsidiaries that retained and contracted with Rattagan. *See* Docket No. 27. Second, Uber Technologies moved to dismiss the FAC under Rule 12(b)(6), arguing that even taking Rattagan's allegations as true, they failed to state a claim. *See* Docket No. 23. The Court did not reach the merits of Uber's Motion to Dismiss the FAC because it agreed that "Rattagan presented the Court with a complaint that was inaccurate and misleading." *See* Docket No. 36 at 8. Rather than advancing a legal theory pursuant to which Uber Technologies "was somehow legally responsible based on its indirect control over Uber International Entities with whom Mr. Rattagan contracted (whether via an alter ego or other theory)," the Court found that "Mr. Rattagan deleted that allegation and worded the FAC so as to

4

imply a direct relationship with Uber Technologies." *Id.* The Court granted Uber Technologies' Motion for Sanctions after concluding that the company had met its burden to show that the complaint was "factually baseless from an objective perspective." *Id.* Mr. Rattagan was permitted leave to amend. *Id.* at 10.

Mr. Rattagan then filed a Second Amended Complaint on September 18, 2019. *See* Docket No. 38. But just one day prior to Uber Technologies' deadline to file a motion to dismiss, Mr. Rattagan's counsel filed a motion to withdraw as attorney. *See* Docket No. 46. The Court extended Uber Technologies' deadline to respond to the Second Amended Complaint, and, after replacement counsel was identified, the Court granted Mr. Rattagan's attorney's motion to withdraw in January 2020. *See* Docket Nos. 48, 51. In February, Mr. Rattagan's new counsel sought leave to file a Third Amended Complaint. *See* Docket No. 54. Uber Technologies opposed, but the Court—relying on the Ninth Circuit's guidance that Rule 15 should be applied with "extreme liberality"—granted Mr. Rattagan's motion for leave to file a Third Amended Complaint. *See* Docket No. 63. On June 19, 2020, Uber Technologies filed a Motion to Dismiss the Third Amended Complaint. *See* Docket No. 67 ("MTD"). Briefing completed on July 30, 2020, and a hearing took place by Zoom on August 13, 2020. *See* Docket Nos. 67, 71.

### III. DISCUSSION

A.  Legal Standard

Under Rule 12(b)(6), a party may move to dismiss a complaint that fails to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). In considering such a motion, a court must accept all allegations of material fact as true and construe them in the light most favorable to the nonmoving party, although "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Fed. R. Civ. P. 12(b)(6) dismissal." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). While "a complaint need not contain detailed factual allegations," "it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* at 1067–68. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 556 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than sheer possibility that a defendant acted unlawfully." *Iqbal*, 556 U.S. at 678.

B.  Discussion

Uber challenges the four counts asserted in Mr. Rattagan's Third Amended Complaint on several grounds. Because the Court concludes that two grounds (the statute of limitations and the economic loss doctrine) dispose of all of Mr. Rattagan's claims, it does not address the alternative grounds for dismissal advanced by Uber Technologies.

1.  Counts Two and Three Are Time-Barred

Uber contends that Mr. Rattagan's claim for negligence (Count Two) and breach of the implied covenant of good faith and fair dealing (Count Three) are time-barred. *See* MTD at 9. Claims for negligence are subject to a two-year statute of limitations. *See* Cal. Civ. Proc. Code § 335.1. Where a breach of the implied covenant of good faith and fair dealing is based on an oral or implied contract, as is Mr. Rattagan's alleged contract with Uber Technologies,[1] it is also subject to a two-year limitations period. *See* Cal. Civ. P. Code § 335.1; *see also Leon v. Wells Fargo Bank, N.A.*, No. 17-CV-03371-BLF, 2018 WL 3474182, at *3 (N.D. Cal. July 19, 2018). "The statute of limitations usually commences when a cause of action 'accrues,' and it is generally said that 'an action accrues on the date of injury.' Alternatively, it is often stated that the statute commences 'upon the occurrence of the last element essential to the cause of action.'" *Vaca v. Wachovia Mortg. Corp.*, 198 Cal. App. 4th 737, 743 (2011) (quoting *Bernson v. Browning–Ferris Industries*, 7 Cal. 4th 926, 931 (1994)).

The parties here agree that the statute of limitations began to run when Rattagan suffered injury from Uber's alleged actions. They disagree, however, as to when the operative injury occurred. In Uber Technologies' telling, Rattagan's claims accrued "on April 15, 2016, the date on which Rattagan alleges that Uber's purported misconduct first injured him," *i.e.*, when Argentine authorities raided his offices. MTD at 10 (citing TAC ¶¶ 68–69). This would mean that the claims expired on April 15, 2018 (prior to the filing of this lawsuit on April 12, 2019). Mr.

---

[1] Mr. Rattagan's TAC states that there was "never a formal written engagement agreement" for the services that he allegedly provided to Uber Technologies. TAC ¶ 37.

Rattagan, on the other hand, asserts that the operative injury did not occur until November 2017, when he was arrested for aggravated tax evasion. Opp. at 14.

Under California law, "the limitations period starts to run when the plaintiff suffers actual and appreciable harm, however uncertain in amount." *Crowley v. Peterson*, 206 F. Supp. 2d 1038, 1042 (C.D. Cal. 2002) (citing *Davies v. Krasna*, 14 Cal. 3d 502, 514 (1975)). Specifically, "[i]t is uncertainty as to the *fact* of damage, rather than to its *amount*, which negates the existence of a cause of action." *Id.* (citing *Walker v. Pac. Indem. Co.*, 6 Cal. Rptr. 924, 926 (Cal. Ct. App. 1960)) (emphasis added). "The California courts have not expressly defined the phrase 'actual and appreciable harm.'" *Id.* However, even cases relied upon by Mr. Rattagan have concluded that "[r]ead in context . . . *Davies*'s 'actual and appreciable harm' test should be seen as simply a restatement of the traditional rule that a cause of action for negligence is complete and the statute begins to run when the plaintiff suffers *any compensable injury*." *Id.* at 1044 (emphasis added); *see also id.* at 1045 ("Most of the California decisions since *Davies* have interpreted 'actual and appreciable harm' as synonymous with 'actionable' or 'compensable' harm.").[2] Under *Davies*, the statute of limitations runs when "events have developed to a point where plaintiff is entitled to a legal remedy, not merely a symbolic judgment such as an award of nominal damages." *Davies*, 14

---

[2] *Crowley* identifies *DeRose v. Carswell*, 196 Cal. App. 3d 1011 (1987) as one of the "few cases since *Davies* [to] have suggested that the actual and appreciable harm test requires something more than a showing of any compensable harm." *Crowley*, 206 F. Supp. 2d at 1045. However, it found *DeRose*'s analysis of *Davies* "not persuasive" and declined to follow its conclusion. *Id.* at 1046. In reaching that conclusion, the *Crowley* court first noted that "the entire discussion of *Davies* [by the *DeRose* court] was dicta" because although the *DeRose* court discussed whether an injury had to be "significant enough to justify a lawsuit" in order to run the statute of limitations, the *DeRose* court concluded that the plaintiff's injury *was* sufficiently significant; thus, its discussion of whether such significance was *necessary* was dicta. *Crowley*, 206 F. Supp. 2d at 1046. Second, the *Crowley* court noted that "the *DeRose* Court provided no authority to support its view that 'nominal' could not reasonably be interpreted as meaning one dollar," but instead means "too insignificant to justify a lawsuit." *Id.* at 1046, 1047.

*Crowley* also notes that only two other case have followed *DeRose*'s interpretation of *Davies*. *Id.* at 1046 n.7 (citing *Miller v. Lakeside Village Condo. Ass'n Inc.*, 1 Cal. App. 4th 1611 (1991); *Sanderson v. Int'l Flavors & Fragrances, Inc.*, 1996 WL 529274 (C.D. Cal. July 11, 1996)). However, neither case "analyzed whether *DeRose*'s interpretation of *Davies* was correct or analyzed the *Davies* holding in light of the cases the California Supreme Court relied on [in rendering the *Davies* decision]"; thus, the *Crowley* court concluded that the two cases "do not provide any independent support for the *DeRose* Court's interpretation of *Davies*'s holding or the term 'nominal damages.'" *Id.*

7

Cal. 3d at 513.  As *Crowley* explained, "any compensable injury will, by definition, give rise to damages that are more than nominal."  *Crowley*, 206 F. Supp. 2d at 1045.

Here, Mr. Rattagan disclaims any harm prior to November 2017, when he was arrested for aggravated tax evasion.  Opp. at 14.  However, his Third Amended Complaint tells a different story.  For example:

- In the immediate aftermath of the Uber launch on April 12, 2016, "taxi drivers surrounded the office building and protesters blocked its exits, preventing employees and clients from entering or exiting for hours.  Additionally, local media outlets were filled with angry interviews and negative coverage concerning 'Uber' and all those associated with it, including Rattagan and his firm."  TAC ¶ 66.
- Several days after the launch, "police raided Rattagan's offices armed with an 'acta' (a search warrant) and issued an order to shut down 'Uber.'  According to the warrant, the raid was the result of a charge that Rattagan, as the legal representative of 'Uber,' was using public space for commercial gain, without a permit.  Television cameras filmed the police raid.  The prime-time news programs displayed the Rattagan firm logo and reported that his offices were the location of Uber's illegal activities, which included tax evasion."  *Id.* ¶ 69.
- That same day, Mr. Rattagan asked to be replaced as legal representative of the international Uber entities, and when Uber's Head Counsel for Latin America Operations failed to act immediately, Mr. Rattagan resigned.  However, his TAC notes that, at that point, "*the damage was done*."  *Id.* ¶ 68 (emphasis added).
- After the launch, "[t]axi drivers, labor unions, and politicians had a local public face to direct their ire and Rattagan was it.  He was smeared in the local media for his alleged role in UTI's launch of Uber Ridesharing."  *Id.* ¶ 81.
- On May 26, 2016, Mr. Rattagan spoke with General Counsel and Corporate Secretary for Uber Technologies and asked her "to promptly designate someone he could coordinate with to hand over his 'Uber'-related files in an orderly manner and to instruct her team to immediately refrain from mentioning or invoking

>    Rattagan's name and from using his offices as legal domicile in any future communications with the Argentine government (national, provincial or city levels) or with any third parties without Rattagan's prior written consent." *Id.* ¶ 73. He alleges that, at that time, Uber Technologies' General Counsel acknowledged that Uber Technologies "was responsible to Rattagan *for the harm caused by the unlawful launch*." *Id.* (emphasis added).

In attempting to explain why he did not experience "actual or appreciable harm" until his arrest in November 2017, Mr. Rattagan asserts that the arrest prohibited him from traveling abroad and also damaged his professional reputation. Opp. at 15. While the 2017 arrest may have exacerbated his harm, the Complaint clearly alleges damage to Mr. Rattagan's professional reputation as early as April 2016 in the immediate aftermath of Uber's launch; as noted above, the local media ran negative coverage of Rattan and his firm, TAC ¶ 66, and prime-time news programs showed footage of the police raid on Rattagan's firm and "reported that his offices were the location of Uber's illegal activities, which included tax evasion," *id.* ¶ 69. As the TAC alleges, by then "the damage was done." *Id.* at ¶ 68. Thus, even if Mr. Rattagan ultimately experienced additional reputational harm after being arrested in November 2017, the very harm he claims to have suffered as a result of that arrest clearly began in April 2016. He allegedly suffered "compensable injury" – "actual and appreciable harm." Thus, the statute of limitations on Counts Two and Three began to run in April 2016.

Mr. Rattagan attempts to avoid that conclusion by further asserting that his claims accrued in 2017 due to "continuing-wrong accrual principles." Opposition to Motion to Dismiss TAC ("MTD Opp.") at 14, Docket No. 70. "There are two main branches" of continuing-wrong principles: "the continuing violation doctrine and the theory of continuous accrual." *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1197 (2013). The former "aggregates a series of wrongs or injuries for purposes of the statute of limitations, treating the limitations period as accruing for all of them upon commission or sufferance of the last of them." *Id.* at 1192. It is animated by the concern that "[s]ome injuries are the product of a series of small harms, any one of which may not be actionable on its own." *Id.* at 1197. Under the latter, "a series of wrongs or injuries may be

1    viewed as each triggering its own limitations period, such that a suit for relief may be partially
2    time-barred as to older events but timely as to those within the applicable limitations period." *Id.*
3    at 1192.

4    What is critical is that both the continuing violation and continuous accrual doctrines are
5    triggered by ongoing *acts* by the defendant. *See Richards v. CH2M Hill, Inc.*, 26 Cal. 4th 798, 812
6    (2001) ("[T]he continuing violation doctrine comes into play when [a plaintiff] raises a claim
7    based on conduct that occurred in part outside the limitations period."); *Aryeh*, 55 Cal. 4th at 1199
8    ("[Continuous accrual applies whenever there is a continuing or recurring obligation: When an
9    obligation or liability arises on a recurring basis, a cause of action accrues each time a wrongful
10   act occurs, triggering a new limitations period.") (citation and internal quotation marks omitted).
11   It is not enough that the plaintiff merely suffers ongoing *injury*. As California courts have
12   explained, "if continuing injury from a completed act generally extended the limitations
13   periods, those periods would lack meaning. Parties could file suit at any time, as long as their
14   injuries persisted. This is not the law." *Vaca*, 198 Cal. App. 4th at 745.

15   The alleged misconduct by Uber Technologies did not extend into the two-year limitations
16   period, which reached back to April 12, 2017. For example, Mr. Rattagan complains that Uber
17   kept him as Uber's representative in Argentina for more than two months after the launch even
18   though he requested immediate replacement. TAC ¶¶ 68, 71. But even if his causes of action
19   accrued two months after the launch, that would place the trigger date at mid-June of 2016 (and
20   generate a filing deadline of June 2018, well before the date in 2019 when Mr. Rattagan filed this
21   lawsuit). Similarly, Mr. Rattagan recounts an occasion when Uber delivered a letter to City
22   officials that showed Mr. Rattagan's law firm office address and name, falsely implying his
23   ongoing association with Uber. *Id.* ¶¶ 71–72. But that incident, too, occurred within the two
24   months after Uber's launch.

25   Mr. Rattagan also argues that Uber Technologies "continuously breached the duties owed
26   to Rattagan after the launch, and these breaches culminated in Rattagan's arrest for aggravated tax
27   evasion in November 2017." MTD Opp. at 16. Specifically, in April 2017, Mr. Rattagan was
28   charged with "the unauthorized use of public space with a commercial aim." TAC ¶ 77. Then in

November 2017, he was charged with aggravated tax evasion. *Id.* ¶ 78. He alleges the tax evasion charge arose from the fact that Uber had failed to pay appropriate sales tax prior to the launch, and it was deemed aggravated "due to the uninterrupted and increasing volume of Uber Ridesharing's sales in the year after the launch." *Id.* ¶¶ 77–79. Under this theory, Uber's continued noncompliance with the law (up through November 2017, when Rattagan was charged with aggravated tax evasion) was an ongoing act that triggers continuing-wrong accrual principles.

However, Mr. Rattagan was replaced as Uber's legal representative approximately two months after Uber's launch in Buenos Aires in 2016, TAC ¶ 68, and his TAC does not explain how he would be held criminally responsible for Uber's continued non-compliance in the year after he was replaced as the company's legal representative. Instead, the TAC alleges only: "The alleged tax evasion charges were aggravated due to the uninterrupted and increasing volume of Uber Ridesharing's sales in the year after the launch." *Id.* ¶ 79. Because Mr. Rattagan's role as Uber's legal representative terminated in mid-2016, Uber's continuing noncompliance in the time between Mr. Rattagan's removal as the company's legal representative and his arrest for aggravated tax evasion is not the kind of continuing conduct to which the continuous accrual doctrine applies. Mr. Rattagan cites no persuasive case law involving similar facts.

To the extent that Mr. Rattagan contends that Uber's wrongful act was not just mere noncompliance, but instead the company's failure to "inform authorities that Rattagan was unaware of and uninvolved in the launch," Mr. Rattagan has pointed to no case law indicating that the company actually owed Mr. Rattagan an affirmative duty to publicize the fact that he was no longer the company's representative. For one thing, Mr. Rattagan alleges that he was replaced as the company's legal representative in Argentina within two months of the launch. *Id.* ¶ 68. His replacement was a matter of public record. *Id.* ¶¶ 68, 75. As of two months after the launch, official records would have indicated that he was no longer the legal representative of Uber in Argentina.

Finally, the continuing violation doctrine does not apply for an independent reason. That doctrine applies where there is "a series of small harms, any one of which may not be actionable on its own." *Aryeh*, 55 Cal. 4th at 1197 (2013). It does not apply where the defendant engaged in

discrete wrongful acts which caused injury to the plaintiff sufficient to give rise to a legal claim. Although allegations of "a pattern of reasonably frequent and similar acts may . . . justify treating the acts as an indivisible course of conduct actionable in its entirety, notwithstanding that the conduct occurred partially outside and partially inside the limitations period," that is not the case where a plaintiff alleges "a series of discrete, independently actionable alleged wrongs." *Id.* at 1198.

Accordingly, the Court **GRANTS** the motion to dismiss Mr. Rattagan's negligence claim (Count Two) and breach of the implied covenant of good faith and fair dealing claim (Count Three) on statute of limitations grounds.

2. <u>Counts One and Four Are Barred by the Economic Loss Doctrine</u>

Defendant also contends that Mr. Rattagan's claims for fraudulent concealment (Count One), negligence (Count Two) and aiding and abetting fraudulent concealment (Count Four) are barred by the economic loss doctrine. *See* MTD at 11. As Count Two has already been dismissed on statute of limitations grounds, it is not discussed further in this section.

Summarized briefly, the economic loss rule limits a party to a contract "to recover[ing] in contract for purely economic loss due to disappointed expectations," rather than in tort, "unless he can demonstrate harm above and beyond a broken contractual promise." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004). The rule "serves to prevent every breach of a contract from giving rise to tort liability" and "prevents the law of contract and the law of tort from dissolving one into the other." *JMP Sec. LLP v. Altair Nanotechnologies Inc.*, 880 F. Supp. 2d 1029, 1042–43 (N.D. Cal. 2012) (quoting *Robinson*, 34 Cal. 4th at 988). In short, generally one cannot recover tort damages for breach of contract. Here, Uber Technologies argues that Mr. Rattagan "alleges only economic loss—*e.g.*, reputational harm, lost revenues—not physical injury or injury to property. Such economic losses are recoverable, if at all, in contract. Consequently, his tort claims must be dismissed." MTD at 12 (citing TAC ¶¶ 65–66, 69, 80–81, 87, 91, 96, 102). Mr. Rattagan offers three arguments in response.

First, Mr. Rattagan argues that the economic loss doctrine should not apply because it "normally applies in products liability and construction defect cases where physical injury is even

12

possible." MTD Opp. at 17 (quoting *Rowland v. JPMorgan Chase Bank, N.A.*, WL 992005, at *10 (N.D. Cal. Mar. 12, 2014)). Because he "was not a purchaser nor is this . . . a products liability or construction defect case," he contends that the doctrine does not bar his claims. *Id.* However, the economic loss rule has been applied outside of the products liability and construction defect contexts. MTD Reply at 5 (collecting cases); *see also Sorensen v. New Koosharem Corp.*, No. CV1501088RGKPJWX, 2015 WL 12826460, at *3 (C.D. Cal. June 29, 2015) (applying the economic loss doctrine to bar fraud claims in the context of claims related to an executive employment contract). There is no *per se* rule limiting the economic loss doctrine to products liability or construction defect cases.

Second, Mr. Rattagan alleges that "[t]he economic loss rule does not apply for the additional reason that Rattagan alleges fraud in the inducement." MTD Opp. at 18. However, Mr. Rattagan's TAC actually alleges "fraudulent concealment," which involves non-disclosure after the contractual relationship arose; it does *not* allege fraud in inducing Mr. Rattagan into the contract. Although there is some conflict in this area of the law, the weight of authority counsels in favor of applying the economic loss doctrine to fraudulent concealment, but not to fraudulent inducement. *Sloan v. Gen. Motors LLC*, No. 16-CV-07244-EMC, 2020 WL 1955643, at *24 (N.D. Cal. Apr. 23, 2020); *compare United Guar. Mortg. Indem. Co. v. Countrywide Fin. Corp.*, 660 F. Supp. 2d 1163, 1188 (C.D. Cal. 2009)) ("The economic loss rule poses no barrier to a properly pled fraudulent inducement claim: '[I]t has long been the rule that where a contract is secured by fraudulent representations, the injured party may elect to affirm the contract and sue for fraud.'"); *with Traba v. Ford Motor Co.*, No. 218CV00808SVWGJS, 2018 WL 6038302, at *4 (C.D. Cal. June 27, 2018) (holding that economic loss doctrine applies to and bars plaintiffs' allegations of fraudulent concealment).

Moreover, to get around the economic loss doctrine, the fraud must be based on an affirmative misrepresentation. In *Robinson Helicopter Co. v. Dana Corp.,* 102 P.3d 268 (2004), the key California case on this subject, the California Supreme Court explained: "The economic loss rule requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise."

34 Cal. 4th at 988 (internal citations and quotation marks omitted).  It concluded that "the economic loss rule does not bar . . . fraud and intentional misrepresentation claims . . . [that] were independent of [defendant's] breach of contract."  *Id.* at 991.  However, the *Robinson* court based that determination on the defendant's "affirmative intentional misrepresentations of fact":  "Our holding today is narrow in scope and limited to a defendant's *affirmative misrepresentations* on which a plaintiff relies and which expose a plaintiff to liability for personal damages independent of the plaintiff's economic loss."  *Id.* at 993 (emphasis added).  Numerous courts have since relied on *Robinson* in holding that affirmative representations are required for exceptions to the economic loss rule to apply.  *See, e.g.*, *Stewart v. Electrolux Home Prod., Inc.*, 304 F. Supp. 3d 894, 902 (E.D. Cal. 2018); *Zagarian v. BMW of N. Am., LLC*, No. CV 18-4857-RSWL-PLA, 2019 WL 6111731, at *3 (C.D. Cal. Oct. 23, 2019); *Traba*, 2018 WL 6038302, at *4.

Here, Mr. Rattagan's fraudulent concealment allegations do not contain assertions that Uber Technologies or the international Uber entities made any affirmative misrepresentations.  *See, e.g.*, TAC ¶ 84 ("UTI directly and as principal of the Dutch Entities knowingly and intentionally failed to disclose, concealed and/or suppressed material facts from Rattagan . . . ."); *id.* ¶ 98 (similar allegations against the international Uber entities); *id.* ¶ 86 ("Rattagan is informed and believes and thereon alleges that UTI directly and as principal of the Dutch Entities intentionally concealed these facts from Rattagan because it knew that its actions would be deemed unlawful under Argentine law and did not want Rattagan taking any steps that might interfere with or delay the launch of Uber Ridesharing in Buenos Aires."); *id.* ¶ 101 ("UTI aided and abetted the Dutch Entities' fraudulent nondisclosure as set forth herein.  UTI knew that the Dutch Entities' conduct constituted a breach of their duty of disclosure to Rattagan and UTI provided substantial assistance and/or encouragement to the Dutch Entities to engage in the fraudulent conduct described herein. Rattagan is informed and believes and thereon alleges that UTI expressly or impliedly directed the Dutch Entities to conceal these facts from Rattagan because it knew that its actions would be deemed unlawful under Argentine law and did not want Rattagan taking any steps that might interfere with or delay the launch of Uber Ridesharing in Buenos Aires.").  Accordingly, Mr. Rattagan's fraudulent concealment allegations would not

operate to bar the application of the economic loss doctrine against his first and fourth claims.

Finally, Mr. Rattagan asserts that "the crux of [his] claims is based on [Uber Technologies'] tortious conduct (and that of the Foreign Shareholders), not on their failure to pay him for services rendered (i.e., the failure to make good on contractual promises). In fact, Rattagan does not even allege breach of contract." MTD Opp. at 18. In other words, he argues that he is not "attempt[ing] to recast a breach of contract claim as tort claims based on an alleged failure to make good on contractual promises" and therefor that the economic loss doctrine should not apply. *Id.* But here, too, Mr. Rattagan's complaint tells a different story.

In alleging his fraudulent concealment claim (Count I), Mr. Rattagan asserts that Uber Technologies "owed Rattagan a duty to disclose all facts known to [Uber Technologies] that were material to both Rattagan's legal representation and his role as legal representative of the Foreign Entities," and that this duty was "[b]ased on the direct attorney-client relationship between [Uber Technologies] and Rattagan." TAC ¶ 83; *see also id.* ¶ 94 ("UTI and Rattagan were in express and/or implied contractual relationships arising from UTI and Rattagan's direct attorney-client relationship starting in 2015."). Likewise, in alleging his aiding and abetting fraudulent concealment claim (Count 4), Mr. Rattagan states: "Because of the Dutch Entitie[s'] confidential, attorney-client relationship with Rattagan, the Dutch Entities owed a duty to Rattagan to disclose these material facts." *Id.* ¶ 99. The attorney-client relationship is undoubtedly a contractual one. *See, e.g.*, *Sky Valley Ltd. P'ship v. ATX Sky Valley, Ltd.*, 150 F.R.D. 648, 651 (N.D. Cal. 1993) ("[T]he attorney-client relationship can be formed . . . only by contract, express or implied."); *Fox v. Pollack*, 181 Cal. App. 3d 954, 959 (1986) ("Except for those situations where an attorney is appointed by the court, the attorney-client relationship is created by some form of contract, express or implied, formal or informal.").

The California Supreme Court has recognized that "a party's contractual obligation may create a legal duty and that a breach of that duty may support a tort action." *Robinson*, 34 Cal. 4th at 989. However, "conduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law." *Erlich v. Menezes*, 21 Cal. 4th 543, 551 (1999). As noted above, as to Uber Technologies, Mr. Rattagan specifically

15

alleges:

> Based on the direct attorney-client relationship between UTI and Rattagan starting in 2015, UTI's principal/agent relationship in 2013 and Rattagan's role as legal representative of the Foreign Shareholders at the request and for the benefit of UTI directly and as principal, UTI both directly and as principal owed Rattagan a duty to disclose all facts known to UTI that were material to both Rattagan's legal representation and his role as legal representative of the Foreign Entities.

TAC ¶ 83. Here, the duty of disclosure allegedly owed by Uber in its capacity as Mr. Rattagan's client is rooted in the contractual relationship. Mr. Rattagan alleges that Uber Technologies breached its "duty to disclose all facts known to [Uber Technologies] that were material to both Rattagan's legal representation and his role as legal representative," and that this duty was "based on" the "direct attorney-client relationship between" Uber Technologies and Mr. Rattagan. *Id.* Likewise, as to the international Uber entities, Mr. Rattagan alleges that they breached their "duty of disclosure to Rattagan," TAC ¶ 101, and that this duty existed "[b]ecause of the Dutch Entitie[s'] confidential, attorney-client relationship with Rattagan." *Id.* ¶ 99. These allegations are squarely inconsistent with his now-raised assertion that Uber Technologies breached a duty that was "independent of the contract." *See Erlich*, 21 Cal. 4th at 551.

In his briefing and at the hearing, Mr. Rattagan presented the following hypothetical in support of his position:

> A lawyer is handed a box by his client to deliver to the client's business partner. The client conceals from his lawyer that illegal contraband is in the box. The lawyer is arrested and charged with possession. Under UTI's view of the law, the lawyer has no recourse against the client.

Opp. at 11 n.10. However, as the distinction in *Erlich* makes clear, such an action clearly "violates a duty independent of the contract arising from principles of tort law." *Erlich*, 21 Cal. 4th at 551. That conclusion is underscored by the fact that any person who hands any other person a box containing illegal contraband puts the unknowing recipient in harm's way. No contract between the parties is needed for that to be true; it does not matter whether the recipient is a lawyer or the neighbor next door. The hypothetical proves nothing.

Accordingly, the economic loss doctrine bars Counts One and Four.

16

## IV. CONCLUSION

In light of the foregoing analysis, the Court **DISMISSES** the Third Amended Complaint. The dismissal is with prejudice because Mr. Rattagan has demonstrated, through multiple iterations of his allegations, many of which exemplify shifting and often inconsistent and contradictory allegations and theories, that his claims suffer from deficiencies that cannot be cured by further amendment.

This order disposes of Docket No. 67. The Clerk is directed to enter judgment and close this case.

**IT IS SO ORDERED**.

Dated: August 19, 2020

_____
EDWARD M. CHEN
United States District Judge